# PREROGATIVE COURT.

In the matter of the will of NANCY MAXWELL ; GEORGE MAX-
WELL, caveator.

When a will is signed and published with the proper solemnities and in the usual
manner, the testator declaring that he published the same as his last will and testa-
ment, the presumption is that he knew its contents. What circumstances not suffi-
cient to overcome this presumption.

This was an appeal from a decree of the Orphans' Court of
Essex county, made February 4, 1849, establishing the will of
Nancy Maxwell, and admitting the same to probate.

The substance of the testimony on which the decree of the
Orphans' Court was made is as follows :

*Sidney A. Lyon.* The paper purporting to be the will, dated
June 9, 1847, being shown to him, he says : he is one of the
witnesses to the will ; saw Nancy Maxwell sign the will ; the
other witnesses whose names are subscribed to the will were
present with him when the will was signed by the testatrix : it
was done at the office of James W. Wade, Esq., in Union, who,
with Daniel Burnet, were the other subscribing witnesses. They
signed their names as witnesses at the same time with him, and
were present in the room with the testatrix at the time of their
signing as witnesses and at the time she signed it.

On *cross-examination*, he says : He was called upon by Elias

Crane to go to Esq. Wade's store for the purpose. Witness's shop is within 100 yards of Esq. Wade's store. Mr. Crane was alone when he called on witness. He lives about half a mile from witness's. He told me, at the time, he wished me to witness the will of Nancy Maxwell. When I got to Esq. Wade's store, I found Mr. Crane there. The will was executed there. When I went into the store I found there Nancy Maxwell, Daniel Burnet and James W. Wade, Esq. Nancy Maxwell was standing by the counter near Mr. Wade. I was asked to sign my name as a witness, I believe by Mr. Wade. I don't remember any conversation after I went into the store before I was asked to sign the will; I think there was none. There was no conversation between the time I was asked to sign the will and the execution of it. When Mr. Wade asked me to sign the will it was on the counter before them. I saw Nancy Maxwell sign the will. Mr. Wade first signed the will as a witness. Daniel Burnet then put his name on the will. I signed it last as a witness. After the will was signed as aforesaid nothing was said but that Mr. Wade should keep it in his hands : Mr. Crane said that ; but nothing further to my recollection. I believe Mr. Wade did not make any reply. Mr. Crane brought Nancy Maxwell there I believe; I saw his carriage there, which leads me to believe so. I should think Nancy Maxwell, from her appearance, was at the time about 70 : I know nothing about her age. She appeared to be well at that time. After the will was signed Miss Maxwell had no conversation with me or any other person. It was about 10 o'clock in the morning when the will was executed.

*In chief.* I left Nancy Maxwell in the store. She took the will with her, or said she would take it; and afterwards said she would take care of it. She took the will in her hands : it was in her hands the last I saw of it when I left the the store.

*Cross-examined.* It was in reply to the remark of Mr. Crane that Mr. Wade could take care of the will, that she said she could take care of it.

*James W. Wade.* I reside in Union ; was acquainted with Nancy Maxwell for 40 years ; she resided about two miles from my store. I drew the will. (He proves the execution of the will.) Elias Crane came to my store, on the day the will was executed, with the testatrix. I think Mr. Crane and the testatrix came into the store together ; and Mr. Crane said, as I think, "Aunt Nancy has come over to have that writing executed." It appears to him Daniel Burnet was there when they came in. I told Mr. Crane it was necessary to have three witnesses : I told him so in the hearing of the testatrix : and Mr. Crane went after Sidney A. Lyon. As soon as Mr. Lyon came in, I think I said, Miss Maxwell, or Nancy Maxwell wanted them to witness her will : this I said in her immediate presence or in her hearing. I think the will was open, and I showed her where to put her name, and gave her a pen and ink. She then signed her name to the will. I then said to her, " You publish and declare that to be your last will and testament ;" and she said "yes." The subscribing witnesses then signed their names. I then folded the will up, and asked her what she would have done with it, and put it in an envelope and sealed it with two seals. While I was doing this, Mr. Crane said, perhaps you had better leave it with Mr. Wade as it was sometimes done. I then wrote on the outside of the envelope " Miss Nancy Maxwell's will." About the time I had written on the envelope she said she believed, or guessed, she could take care of it herself, or something like that. I handed the will to her, and she took it ; and I saw nothing more of it after that. I think she put the will in a work-bag or something of that kind, but will not be certain. After the will was executed she got some few little things out of the store. She had been in the habit of occasionally trading at my store. She did not often come herself, but Mr. Crane's son, who lived in the house with her, frequently got things for her. I think she did not at that time keep a horse or conveyance of her own.

*Cross-examined.* Mr. Crane and testatrix came, when the will was executed, in a light carriage of Mr. Crane's. When

Mr. Crane made the remark "Aunt Nancy has come to have that writing executed," I don't know where the will was; it was not in my possession. Before that time I don't know that I had seen the testatrix in three months; never had any talk with her about making her will. The will is all in my hand-writing. I don't think the said will had been written but a few days before its date. To the question "Who dictated that will to you?" the witness answers, I don't know that I can tell. Elias Crane asked me to draw the will : I think it was in my store he asked me. I guess there was no one with him, and if there was any one there, Mr. Crane spoke to me privately, so nobody else could hear. I did not know anything at the time about the situation of the property of the testatrix. I got the information to enable me to draw the will from Elias Crane : he gave it to me in writing, something in the shape of a will; it was headed in the shape of a will. I don't know but I could tell Elias Crane's hand-writing. I can't say whose hand-writing the paper headed as a will was, and that is the reason why I can't tell who dictated the will. I did not take much notice of the writing. From my recollection I cannot say whether the said paper resembled Mr. Crane's hand-writing. I don't believe said paper was in my possession over twenty-four hours. I don't know but I might have said the said paper was in Mr. Crane's hand-writing, or I thought it was in his hand-writing. The caveator, George Maxwell, is the person who talked to me about the said paper, and the information I then gave him was according to the truth as I then understood it. I gave the said paper to Elias Crane again after the will was written; I gave both together to him. I told Mr. Crane the will was written, and he called and got it. I never talked with the testatrix about the contents of the will. Mr. Crane lived about a mile from the testatrix. The wife of Elias Crane is named Esther, and is a sister of the testatrix. I don't know what the homestead farm of the testatrix was worth. The farm formerly belonging to John Maxwell, deceased, (which was the homestead of the testatrix,) was worth, some of it $100 an acre, some of it perhaps more, and some not more than $25 an acre. I was one of the appraisers, and ap-

praised the personal estate of the testatrix at $6,532.43. There was about $350 of the notes we considered doubtful. I can't recollect who produced the will at the time they came to get it executed, whether the testatrix or Elias Crane. At the time the will was signed by the testatrix in my store I can't tell and don't know whether she knew the contents of it. She paid me for drawing the will before she left the store, when she paid me for the things she got in the store. When Mr. Crane handed me the paper above mentioned to draw the will by, he asked me if I did n't think that was pretty well done, or, was a very good will for a female, or something like that. I don't think he asked my opinion about the leaving the property. I guess nobody lived with the testatrix that I know of. John Crane lived in the house adjoining hers : I mean, by adjoining, the building put close up to the other as it can be and connected. I have understood it was not on the land and part of the homestead of testatrix, but that John Crane had bought the land and built upon it. I don't know but the land on which John Crane's house stood belonged to the wife of Elias Crane as her part of David Maxwell's estate. John Crane is the same John Crane named in the will as son of Esther Crane ; and is the son also of Elias Crane. John Crane's building communicated by a door with the house of testatrix, and John occupied part of the main house of testatrix. John Crane has a wife and three or four children. I think John Crane lived on the farm of testatrix seven or eight years ; believe he worked her farm, but don't know on what terms. When I looked at said paper handed me by Elias Crane to draw the will by, I told him I thought it was necessary to have the names of the nephews and nieces, instead of the general terms nephews and nieces. He said he did not know all their names, but would get them; which he did, and brought them to me on a piece of paper, in the course of a day or two. I only changed the form of the paper in the will, without changing the meaning. Elias Crane seemed to want it done : I don't know that he showed much anxiety about it. He asked me once after if the will was done. I told him it was, and he called

in a day or two, or may be in twenty-four hours, and got it. None of his family called for it or asked about it.

*In chief.* Elias Crane called on me and said, "Aunt Nancy is getting old and she thought she had better make a will, and wanted to know if I would go and write a will for her;" but nothing was said where I was to go. I told him I could not leave home; but if she would send me the heads of it, I would write it, and if it wasn't written right at first, I would re-write it. In a few days Elias Crane brought the above mentioned paper as a guide for me to draw the will by. I then read the paper and mentioned, as above, about the names of the nieces. It was shortly after our above conversation that Elias Crane brought the said paper; and the next day, I think, I drew the will. I rather think the names of Elias Crane's children were mentioned in the said paper, but don't know. Elias Crane, in the conversation above alluded to, said he did not know the names of the nephews and nieces of the other members of the family except his wife. I don't know of Elias Crane transacting other business for the testatrix than calling at the store to get things for her, except, upon being reminded, that the said Elias put out to the County, for testatrix, money, and I paid the interest to him for her. He brought the bond which was payable to the testatrix, and the interest was endorsed on the bond, which was for $600.

*Cross-examined.* I cannot say that she placed more or particular confidence in Elias Crane. Sometimes she used to show the same confidence in George Maxwell. I don't know that the testatrix had any difficulty with the children of Abm. Maxwell, or of her sister Susan Foster, or of her sister Mary Meeker. I thought she was on good terms with all of them. I have understood that some of the nephews and nieces of testatrix lived at a great distance from her. Elias M. Crane and Amzi A. Crane live with their father Elias Crane. George Maxwell has also collected interest of me for the testatrix, on notes payable to her: he brought the notes with him.

*Daniel Burnet* testifies, that, on the day the will was executed, Elias Crane called on him to go to Esq. Wade's and witness an instrument of writing. He lives a quarter of a mile, may be a little more, from Esq. Wade's. That on their way down Mr. Crane told him that Aunt Nancy was about having her will executed. When they arrived at the store he found the testatrix there and Esq. Wade, and nobody else that he recollects. Sidney A. Lyon came there afterwards. He don't recollect that there was anything said about its being a will by anybody in the presence of the testatrix before it was executed. (He proves the due execution of the will.) Esq. Wade said, when the witnesses were all there, that they had come to sign the will as witnesses for Miss Maxwell, and *it was* all ready; and he handed it to her and gave her the pen he held in his hand, and, he believes, pointed to the place where she was to sign her name. After the will was executed it was done up in an envelope and the testatrix took it. There was something said about leaving the will with Esq. Wade, I think by Elias Crane, and she said she could take care of it herself.

*David Wade*, for the caveator. Was acquainted with testatrix in the latter part of her life; lived about half a mile from her. She died at the place on which she had always lived. Was acquainted with the John Maxwell farm; should think it was worth, at testatrix's death, $4,000. Was acquainted with Abner Maxwell, the brother of testatrix. He left, at his death, eight children, viz., John A., Jane, William, David W., George, Mary, James and Hannah; of whom John A., Jane and Hannah died after their father, and before testatrix. John A. left one son, who is still living. Jane and Hannah died without children. The son of John A. is not far from 16 years old I think; his name is John A., and he lived in New York at the time of the death of testatrix, and lives there yet. He lives with his mother, who keeps a boarding house as I understand. He was in the habit of coming out to Union frequently the last five or six years in the summer season. He has some little acquaintance with one of the children of Susan Foster, sister of

testatrix, and knows some others by sight, but don't know how many there are. Susan Foster is dead. Was not acquainted with Mary Meeker, another sister of testatrix. Has understood she is dead, but don't know how many children she left. Is acquainted with Phebe Miller, niece of testatrix; she is married, and her husband is living. She is daughter of Elias Crane, the executor named in the will. She has two daughters. Is acquainted with Esther, wife of Elias Crane; she has three sons, John, Elias and Amzi. John has children, but can't say how many; I believe six. He has a son married, John M. Crane. Elias and Amzi are single men. Mary Ann Winans, Phebe Miller and Susan F. Williams are children of Elias Crane. Elias Crane and witness had some little conversation about the disposition of the property of testatrix, at the time said Elias was going to sell the moveable property. Mr. Crane then said he thought the Maxwell family had had their share of the property. He said the family had been helped a good deal by John Maxwell. He said there was some difficulty about the will, and that he didn't know but it would be better to break it, for then he would get a share of the property, and now the testatrix had not left him any thing.

*Cross-examined.* In the conversation Mr. Crane did not say that Nancy Maxwell said the Maxwell family had been helped by John Maxwell; the name of Nancy Maxwell was not mentioned. Thinks the caveator, George Maxwell, owns about forty acres of the John Maxwell farm; I have heard that a certain portion of said farm was set off to Elias Crane; about 17 acres of the homestead and a detached piece of woodland. In my valuation above, I included only what belonged to the testatrix at her death.

*Stephen Foster,* for the caveator, says : Susan Foster, mentioned in the will, was the wife of witness. He has three sons and a daughter living; another daughter died in May, 1815, being then nine years old. Susan Foster was sister of testatrix. Mary Meeker, another sister of testatrix, died before the date of

the will. Witness's wife died in July, 1846. David, Josiah, Marcus, Edward and Lewis, sons of Mary Meeker, are living, and Nancy M. De Camp and Henrietta Meeker, daughters of Mary Meeker, who are dead, left no children. Phebe Miller, neice of testatrix, is a daughter of Elias Crane. He valued the farm, including Elias Crane's fifth in it, at $4,500; this was a low valuation. He considered it worth that 16 years ago, when it was settled.

*Cross-examined.* I never offered Mr. Elias Crane to give or take $500 for one-fifth of the farm; but offered to give him $500 for one-fifth. I sold to testatrix at that rate I believe in 1830 or 1831. I asked Mr. Crane if he would sell me the fifth at that rate. He said no. He said if I would give at the rate of $4,000 for the whole, he would take it. I think my own children ought to have more than they got by the will, but am not very anxious that they should get more. I feel anxious that they should have their rights, as any parent would. I think my children ought to have more, because they need it. I mean they need it because they are poor. I never would have signed off for $500 if I had thought that Elias Crane would not sign off. Elias Crane did not always say he wouldn't sign off, but he said he would sign off to the testatrix, for $500, if the rest would. I signed off because I thought it was as much as she was able to pay, and that when she died, it would go back to all alike; and it never passed in my mind that there would be any difference among all.

*In chief.* My wife inherited her one-fifth of the property from her brother, David Maxwell. The testatrix also inherited one-fifth; the children of Abner Maxwell one-fifth; the children of Mary Meeker one-fifth; and Esther Crane, wife of Elias Crane, the other fifth. My wife and I conveyed our fifth to testatrix for $500. The children of Abner, also, through my influence, conveyed their fifth; and Mary Meeker and her husband, also, conveyed to the testatrix one fifth, for $500, through my influence. All the heirs of David Maxwell, Elias Crane and all

agreed to convey their shares for $500 a share, to the testatrix, before any one signed off. It was understood among us all, that testatrix was to remain on the place, as she had always lived there, and that we would sign off to her for $500 a share; but to nobody else. After this understanding, and the others had all signed off in pursuance of it, Elias Crane and his wife refused to sign off. I believe John Crane, son of Elias, went to live with testatrix before he was married, but can't say how long after we signed off. John lived in the kitchen built by the said Elias, adjoining the old house, before the share of Elias was set off, and occupied that and two rooms of the old house. I lived four and a half miles from the testatrix. The said kitchen was built by Elias Crane on the David Maxwell property. They made a door of a window in the old house, and made a communication directly with the old house, and occupied two rooms of the old house.

*Cross-examined.* I believe the testatrix knew how to read and write. I can tell her handwriting from any other person in the world. I have done a great deal of business for her. She was pretty good at computing interest. I have collected a good deal of money for her, and she would always look to see if it was right. When I paid her money she did not give me receipts. She put confidence in me, and I took the notes and drew the receipts and she signed them. She may have drawn some receipts, but generally I did. The last time I collected money for her was last summer, and paid it over to her, and she signed a receipt on the obligation. He has heard the will read, and is acquainted with the lands of John Maxwell mentioned in the will. I understand that Abner's son George has bought out the other heirs of Abner. He lives in the house, and I was always impressed with the idea he had bought it. As I understand it, David had the most acres, but Abner had the old homestead of the father of John Maxwell. Abner Maxwell died a long time before his father, John Maxwell. David died after John Maxwell.

*In chief.* After the death of David Maxwell, the testatrix asked me and my wife to come and buy half of the property, and come and live there. Elias Crane objected, and I would not consent, as I wanted to live in peace and friendship with him.

The will of John Maxwell, deceased, dated March 1, 1822, and proved December 12, 1828, was put in evidence in support of the will.

The inventory of the personal estate of David Maxwell, amounting to $6,592.64, was put in evidence on the part of the caveator.

*Abraham C. Miller*, for the caveator. I am acquainted with John Crane, son of Elias; I lived last summer within three hundred yards of him, adjoining his farm. I lived there about six months. John Crane worked the farm of testatrix. She had no oxen or horses I believe, while I lived there. There were oxen and horses used on the farm, and I suppose they belonged to John Crane. They were kept on the farm.

*Cross-examined.* I believe John Crane had but one horse there last summer. He had a pair before, but one last summer. He had about five cows there last summer, and one pair of oxen. I suppose John owned five of the cows; and the widow had one cow.

*Samuel S. Doty*, for the caveator. I heard Esther Crane, wife of Elias Crane, say, in the presence of her husband, that the Maxwell family had been helped by her father considerably when the children were young. I think Elias was present when his wife said so, but will not be certain. I have been in Elias Crane's house almost every day. I am his nearest neighbor.

*Cross-examined.* This conversation was since I heard there was trouble about the will. Elias Crane regretted very much the difficulty.

*Ann M. Maxwell*, for the caveator. I am the widow of John A. Maxwell, deceased, and mother of John A. Maxwell his son, who was fifteen years last December. John A. Maxwell, my husband, has been dead fifteen years last month. My son and I were in the habit of visiting the testatrix frequently; my son oftener than myself. We were both on good terms with testatrix, and never had any difficulty with her; and she rather made a pet of my son. I was out at her funeral, with my son. I was present when the will was produced and opened at her house, in her room, and right away after the funeral. Elias Crane, and I think all his sons and daughters, his wife, Stephen Foster, his son Job, and his daughter Mary, George Maxwell, and pretty much all the family that were interested were present. Mrs. Elias Crane brought the will from the adjoining room, which was the bedroom of testatrix. I did not see the place in the room from which the will was taken. I don't know of any one being invited to go and search for a will; I think Elias Crane came out behind his wife when she brought out the will. She placed the will in the hands of George Maxwell. The will was in an envelope, sealed with three seals, one of which was broken. The envelope, with the will produced here, appears to be the same. Mr. Paige opened the envelope and took out the will. I think George Maxwell handed it to him. Mr. Paige read the will. George Maxwell did not read it because it was said it must be read by some indifferent person.

*Cross-examined.* I recollect that Mrs. Crane came in and out of the room several times; but can't say whether she spoke to her husband about another key, or that she spoke to him. I was not in the bedroom from which the will was brought, that day. I think the last time I was in that bedroom of the testatrix was in September before she died. She had a cupboard or chest of drawers in that room I think when I was last in it. I did not see the testatrix use a key to open a drawer there. I observed it for three years that the testatrix appeared very childish. She was very eccentric. When I heard the will read, and that nothing was given to my son, I didn't feel disappointed.

If there was a will made I didn't expect my son to get any thing; from the circumstances, I expected it would go as it did. I knew my son would be benefitted by law if she died without a will, but not if she left a will, as I didn't expect she would make her will herself.

*In chief.* The reason why I thought my son would not get any thing by her will, I knew she appeared to be influenced by the Cranes. The testatrix never gave anything to my son, or made any presents, but once, when he came from the country he said she had given him two shillings. I mean by her petting him, that she called him in and gave him cakes.

*B. Williamson*, for the caveator.

This paper disposes of $11,000, real and personal estate. The whole of this property, except an acre of turf meadow and about $1500, goes into the family of Elias Crane.

We do not cavil about the execution of the will. But we deny the *factum* of the will—that is, we say she did not know the contents.

When, as here, a paper is executed with the proper solemnities, the presumption is, that the person executing it knew its contents. But this presumption may be overcome. We submit that the circumstances under which Nancy Maxwell signed this paper are such as to overcome this presumption. She was a maiden lady, upwards of 70; under the influence of Elias Crane's family; visiting no one except his family. The paper was prepared through an agent. It will hardly be pretended she could write it; true, she might dictate it. The whole bulk of the estate is thrown into the hands of the children of this agent. A mere pittance is given to others equally near. This agent was one in whom she had confidence. She lived in a small apartment put up by him close to his house; his son living there on the farm with the old lady. It was natural that Mr. Crane should have acquired her confidence; and the law says, that such an one, so selected, stands in a different situation from an

ordinary agent. *Williams on Executors*, 58. Suspicion is greatly increased if the will is in favor of such an agent; and, therefore, if in favor of his children. Under such circumstances Courts will require strong proof that the person executing the paper knew its contents. In a late case in New York, Brady, an attorney at law, drew a will, and it gave all the property to his brothers and sisters; it was set aside. In a case like this, the Court will require strong proof that it was her will, and not a writing prepared by Crane himself for his own purposes. The testimony shows, he submits, that she never had the opportunity of knowing the contents. Crane went to Esquire Wade, and told him Miss Crane wanted to make a will; and in a few days after went again with a writing in the form of a will. It will not be pretended that Miss Maxwell wrote that writing. Submits, from the testimony, that she was wholly incapable of drawing a writing like that. If she did write it it was easy to prove the fact. He submits it is clear that Mr. Crane wrote that paper. Esquire Wade was pressed on this point; and says he did not take sufficient notice of that writing; and yet he drew the will from it. And Wade admits he had said he thought it was Crane's writing. Again, Wade told Crane that the names of the nephews and nieces should be mentioned. Crane told him he did not know the names. This is evidence that Crane wrote that paper. Would not Miss Maxwell, if she had dictated that paper, have named the nephews and nieces? And where is that paper? If it had been written by her, giving nearly all to his family, would not Crane have kept it, to show &c.? Has he lost it; or has he destroyed it? It is clear, he thinks, that that paper was in Crane's writing. And there is no proof that Miss Maxwell ever saw it or knew its contents.

Next, Was any opportunity ever afforded to Miss Maxwell to read the paper offered for probate as a will? It is proved that this paper, after being drawn by Wade, was delivered by him to Crane. It will be presumed to have remained in his possession unless proved otherwise; and it is not shown from whom Wade received it on the day it was executed. Crane came with Miss Maxwell and said, "Aunt Nancy has come to have that paper

executed." It was executed without being read to her. She learnt nothing there of its contents. No doubt she intended to make a will; and she may have thought it was no matter about her knowing the contents then, for that she would have it in her possession, and if it did not suit her, she could &c. Crane's interposition by saying let Mr. Wade keep it has significance. It was sealed up, and delivered to her; and remained so, though in her possession; so that we show she had no opportunity of reading it. I submit that we overcome the presumption arising from the bare production of the will that she knew its contents. If it had been delivered to her not sealed, I admit she would be presumed to know its contents; or if it had been proved that she had declared her intention to make just such a will; and such proof was easy if she had ever intimated such intention. But there are many circumstances going to show she never intended to make such a disposition of her property. Wade told Crane he wanted the names of nephews and nieces. Crane said he didn't know, or had forgotten the names. Could Miss Maxwell have forgotten the young man John A. Maxwell, a son of a nephew, and who often visited her, and whose mother was a widow. His name was dear to Miss Maxwell; and yet he is the only individual of all this family and its branches that is entirely cut off. Again, the real estate came from her brother, David Maxwell; a fifth to her, and the other fifths &c., (as shown by the testimony.) An arrangement was made by the owners of four of the fifth parts to sell out cheap to Miss Maxwell; and it was done under the idea that it would all come back to all. All did it except Crane, who, after agreeing, refused. Now, would Miss Maxwell give all to the man who had treated her thus, or to his family; and against the others, who had complied and conveyed to her?

Miss Maxwell wanted Mr. Foster to come and live with her; and Elias Crane interfered and prevented; and on a certain occasion Crane remarked that the Maxwells had had enough, showing that this was his view; his wife, on another occasion made a similar remark. These are all circumstances worthy of consideration.

Susan Foster, a sister of Miss Maxwell, died leaving four chil
dren, and but $125 apiece is left to them; and they are poor.
Mrs. Meeker, another sister, died, leaving eight children; they
get.but $62 a piece. And the niece Phebe Miller gets an
acre of turf meadow. Wearing apparel is given to seven nieces;
and all the rest of the real estate to Elias Crane's wife, and
after her death to

three of whom are the children of Elias Crane. No reason ap-
pears why such a will should be made. This has weight only
as it shows the agency and influence of Elias Crane. And one
of his sons lived on the farm. 2 *Green's Ch.* 550, 3, 5, 7.

*J. Chetwood* and *F. B. Chetwood* for the will. They cited 1
*Green's Ch.* 82; 1 *South. Rep.* 458; 2 *Ib.* 670.

*J. J. Chetwood* in reply.

THE CHANCELLOR. The will was signed and published with
the proper solemnities and in the usual manner, the testatrix de-
claring that she published the same as her last will and testa-
ment. From such signing and publication the presumption
arises that she knew the contents of the will. The circum-
stances relied upon to overcome this presumption, and to throw
upon the party supporting the will, the burden of proving that
the testatrix knew its contents, are not sufficient for that purpose.
The decree of the Orphans' Court will be affirmed.
Order accordingly.